LYNN M. DEAN (Cal. Bar No. 205562)
Email: deanl@sec.gov
KELLY BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> CHARLES SCHWAB & CO., INC., <br><br> Defendant. | Case No. 18-cv-3942 <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because defendant Charles Schwab

& Co., Inc. ("Schwab") is domiciled in this district.

## SUMMARY

3. In 2012 and 2013, Schwab violated Exchange Act Section 17(a) and Rule 17a-8 by failing to file Suspicious Activity Reports ("SARs") on suspicious transactions by independent investment advisers ("Advisers") that Schwab terminated from its custodial platform. Schwab terminated the Advisers for engaging in activity Schwab determined violated its internal policies and presented risk to Schwab or its customers.

4. Schwab's failure to file the SARs at issue resulted from its inconsistent implementation of policies and procedures for identifying and reporting suspicious transactions under the SAR Rule (31 C.F.R. § 1023.320(a)). Although Schwab investigated and terminated the Advisers, it did not have clear or consistent policies and procedures regarding the types of transactions on which SARs needed to be filed. For example, Schwab did not file SARs in certain instances where it investigated and terminated Advisers for conduct that led, or reasonably should have led, Schwab to suspect that the Advisers had charged certain customers excessive advisory fees, had allowed their state registrations to lapse, or were engaged in schemes involving "cherry-picking" (a fraudulent trade allocation scheme where the Adviser allocates profitable trades to the Adviser's personal account and unprofitable trades to client accounts). In addition, in a number of instances where Schwab investigated and terminated Advisers for conduct that led, or reasonably should have led, it to suspect that the Advisers misappropriated or misused client funds, Schwab applied an unreasonably high standard for determining whether to file a SAR on the suspicious transactions.

## THE DEFENDANT

5. Charles Schwab & Co., Inc. ("Schwab"), headquartered in San Francisco, California, is registered with the SEC as a broker-dealer, investment adviser, and transfer agent. It is a subsidiary of The Charles Schwab Corporation, a publicly traded

company whose stock is registered under Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange.

## THE ALLEGATIONS

**A.    Schwab's Investment Adviser Business and Terminations of Advisers**

6.     Schwab, through its Advisor Services division, offers a broad range of products and services to Advisers and their clients.  These Advisers are not employees of Schwab nor are they affiliated with the firm.  They are independent third-party advisers who have a separate fiduciary relationship with their clients, and contract with Schwab for custodial and execution services.  Investment advisers are persons or firms that are engaged in the business of providing investment advice to others for compensation.  Investment advisers have to register with either the SEC or the state securities agency where they have their principal place of business, depending on the amount of client assets they manage.

7.     Under the Investment Advisers Act of 1940, investment advisers have a broad fiduciary duty to act in the best interests of their clients.  As fiduciaries, investment advisers must avoid conflicts of interest with their clients and are prohibited from overreaching or taking unfair advantage of their clients' trust.  Among the obligations that flow from the investment advisers' fiduciary duty include:  full and fair disclosure of all facts material to the clients' engagement of the investment adviser and a duty to avoid misleading clients; the disclosure of all material facts regarding any actual or potential conflict of interest between the investment adviser and the client; and an obligation to provide only investment advice that is suitable for the client in light of the client's financial situation, investment experience, and investment objectives.

8.     In 2012 and 2013, Schwab terminated its business relationship with 83 Advisers that Schwab determined had violated its internal policies and presented risk to Schwab or its customers.  The terminated Advisers had a combined total of $1.62 billion in assets under management ("AUM") and almost 18,000 subaccounts at

Schwab.

**B.     Schwab's Failure to File SARs on the Suspicious Transactions of Terminated Advisers**

9.      Under the Bank Secrecy Act (the "BSA") (31 U.S.C. §§ 5311-5330) and the SAR Rule (31 C.F.R. § 1023.320(a)), Schwab is required to file SARs with the Financial Crimes Enforcement Network ("FinCEN") to report any transaction conducted or attempted by, at, or through Schwab that involved or aggregated funds of at least $5,000 and that Schwab knew, suspected, or had reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):

      a.   involved funds derived from illegal activity;

      b.   was designed to evade any requirements of the BSA or any regulations under the BSA;

      c.   had no business or apparent lawful purpose or was not the sort in which the particular customer would have normally been expected to engage, and Schwab knew of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

      d.   involved the use of Schwab to facilitate criminal activity.

10.     Under Exchange Act Section 17(a) and Rule 17a-8, Schwab is required to comply with the recordkeeping, retention, and reporting obligations of the BSA and its implementing regulations, including the SAR Rule.  Schwab's failure to file a SAR is a violation of Exchange Act Section 17(a) and Rule 17a-8.

11.     At least 47 of the 83 terminated Advisers engaged in transactions of at least $5,000 that were conducted at, by, or through Schwab and that Schwab, knew, suspected, or had reason to suspect were suspicious under the SAR Rule.  Schwab, however, filed SARs relating to the suspicious transactions of only 10 of the terminated Advisers, and three of those SARs were filed after the SEC had brought an enforcement action against the Adviser.

12. Schwab failed to file SARs relating to the suspicious transactions of the remaining 37 terminated Advisers. These 37 terminated Advisers were registered, or should have been registered, as investment advisers with either the SEC or a state securities agencies and combined had a total of over $840 million in AUM and at least 6,500 subaccounts at Schwab.

13. Schwab's failure to file the SARs at issue resulted from its inconsistent implementation of policies and procedures for identifying and reporting transactions under the SAR Rule. Schwab had a SAR policy that stated that it should file a SAR on any transaction of $5,000 or more that "involves potential fraud." The policy further defined "Securities Fraud" as a "wide range of crimes whereby securities [were] used as an instrumentality in a scheme to defraud," including "market manipulation, making untrue statements in regard to specific securities, attempting to deceive another in connection with the purchase or sale of a security, and attempting to illicitly transact in unregistered or restricted securities."

14. Although Schwab did file SARs relating to the apparent theft of client funds by Advisers, Schwab failed to file SARs relating to other types of potentially illegal or fraudulent transactions by Advisers it terminated. For example, in various instances, Schwab failed to file SARs relating to transactions by Advisers that it suspected, or reasonably should have suspected, involved: (1) an Adviser's possible self-dealing or conflict of interest through the suspicious transfer of funds from client accounts custodied at Schwab to accounts or investments affiliated with the Adviser; (2) the Adviser's use of Schwab's management fee system to charge client accounts excessive advisory fees; (3) patterns of potentially fraudulent transactions in client accounts such as "cherry-picking"; (4) Advisers who Schwab suspected were logging-in or signing in the name of clients to effect or confirm transactions in client accounts; and (5) Advisers who had allowed their registrations to lapse but continued to execute client trades and/or collect advisory fees through Schwab.

15. In addition, Schwab applied an unreasonably high standard for

determining whether to file a SAR on transactions it suspected or should have suspected involved possible misappropriation or other misuse of client funds. As alleged in paragraphs 18 and 19 below, for example, Schwab did not file SARs where it suspected or had reason to suspect that the Adviser had misused client funds but the clients had not complained to Schwab about the transactions.

16. As a result of Schwab's failure to file the required SARs at issue, the SEC and other regulatory or law enforcement agencies were not alerted to the Advisers' suspicious transactions as required.

**C.     Examples of Schwab's Failure to File SARs on the Suspicious Transactions of Terminated Advisers**

17. The suspicious transactions by some of the 37 terminated Advisers involved the suspicious transfer of funds from client accounts custodied at Schwab to accounts or investments affiliated with the Adviser.

18. For example, "Adviser A" was a State-registered Adviser with $14 million in AUM and 244 subaccounts at Schwab. In late 2013, Schwab learned that Adviser A had caused two clients to wire transfer a total of $295,000 from their Schwab accounts to an account controlled by Adviser A. Schwab also learned that shortly after the client funds were wired to Adviser A, Adviser A purchased a personal residence for himself. The clients confirmed to Schwab that they were aware of the wire transfers but could not say what the wire transfers were for. Adviser A told Schwab that he invested the clients in a private residential real estate investment trust but did not provide to Schwab the documents for the purported investment. Schwab then terminated Adviser A.

19. Based on that information, Schwab knew, suspected, or had reason to suspect that the $295,000 in wire transfers were suspicious under the SAR Rule and should have filed a SAR on them. Schwab, however, did not file the required SAR. The memorandum closing Schwab's investigation regarding Adviser A stated, in part, that "[i]t is possible that [Adviser A] used the client's funds for the purchase of his property but this fact can not be confirmed. The wire transfers by the two clients were

researched. Both clients were found to have verified and authorized the wire transfers on recorded lines. This matter is being closed as nothing [was] found since neither client has complained or disputed the wire transfers [Adviser A]." Given the information known to Schwab and Schwab's termination of Adviser A based on that information, the standards requiring a SAR filing were met, and Schwab applied too high a standard by requiring that the misuse be "confirmed" or that the clients complain.

20. As another example, "Adviser B" was an SEC-registered Adviser with $92 million in AUM and 543 subaccounts at Schwab. In 2013, Schwab terminated Adviser B after learning that three of its clients had each invested $100,000 in a private placement of securities by Adviser B's disclosed parent company. Schwab found that the principal of both Adviser B and its parent company was apparently in poor financial condition because he had an outstanding federal tax lien and a recent $2 million civil judgment against him relating to selling investment contracts in life insurance policies.

21. Based on that information, Schwab knew, suspected, or had reason to suspect that the $300,000 in investments were suspicious under the SAR Rule. Schwab therefore should have filed a SAR on the transactions. Schwab, however, did not file the required SAR on the suspicious transactions.

22. The suspicious transactions by some of the 37 terminated Advisers involved Advisers using Schwab's management fee system to charge client Schwab accounts suspicious advisory fees. Schwab, however, failed to file a SAR relating to the terminated Advisers' suspicious fees because Schwab unreasonably believed that such transactions did not warrant SARs.

23. For example, "Adviser C" was a State-registered Adviser with $6.7 million in AUM and 150 subaccounts at Schwab. Schwab terminated Adviser C for using Schwab's management fee system to charge a client a suspicious $28,000 fee, which was up "dramatically" from previous quarterly fees of about $2,000. Schwab

could not verify the fee based on the documentation provided by Adviser C.

24. Based on that information, Schwab knew, suspected, or had reason to suspect that Adviser C had misappropriated funds from the client through charging her an improper fee and that the fee was suspicious under the SAR Rule. Schwab therefore should have filed a SAR on the transaction. Schwab, however, did not file the required SAR on the suspicious fee because it unreasonably believed that such fees did not warrant SAR filings.

25. The suspicious transactions by some of the 37 terminated Advisers involved transactions in client accounts that were part of suspected "cherry-picking" schemes to defraud their clients. Schwab did not file SARs on the suspicious transactions of these Advisers because it unreasonably believed that such conduct did not require a SAR filing.

26. For example, "Adviser D" was an SEC-registered Adviser with $50 million in AUM and 476 subaccounts at Schwab. Schwab found that in 2009 and 2010, Adviser D appeared to allocate 17 profitable day trades for itself for profits totaling about $75,000. Schwab twice counseled Adviser D about the suspicious trading, including telling Adviser D that such apparent preferential trade allocation "should be of concern to [Adviser D] in the case of any audit conducted by the SEC or other regulatory agencies." Schwab terminated Adviser D in 2012.

27. Based on that information, from as early as 2009, Schwab knew, suspected, or had reason to suspect that Adviser D was engaging in a fraudulent cherry-picking scheme and that the trading was suspicious under the SAR Rule. Schwab therefore should have filed a SAR on the trading. Schwab, however, did not file the required SAR on the trading because it unreasonably believed that such apparent preferential trade allocations did not warrant a SAR filing.

28. The suspicious transactions by some of the 37 terminated Advisers involved Advisers whom Schwab suspected of posing as clients to effect or confirm transactions at Schwab.

29. For example, "Adviser E" was a State-registered Adviser with $17 million in AUM and 132 subaccounts at Schwab who did not have discretionary trading authority over its clients' accounts. Schwab terminated Adviser E after he admitted to Schwab that he used the username and password of 20 clients to log on to Schwab's client web portal (rather than following Schwab's rule that Advisers log onto the Adviser's web portal using the Adviser's username and password). Schwab trading records show that trades were made in certain of these client accounts.

30. Based on that information, Schwab knew, suspected, or had reason to suspect that Adviser E was posing as its clients to place trades. Schwab therefore knew, suspected, or had reason to suspect that the transactions were suspicious under the SAR Rule and should have filed a SAR on the transactions. Schwab, however, did not file the required SAR on Adviser E.

31. Finally, the suspicious transactions by some of the 37 terminated Advisers involved Advisers who were not properly registered as an Adviser but executed client trades and/or collected advisory fees through Schwab's management fee system.

32. For example, "Adviser F" was an unregistered Adviser with $3 million in AUM and 78 subaccounts at Schwab. Schwab terminated Adviser F after finding that Adviser F had not been registered as an Adviser for almost two years but had collected over $100,000 in fees through Schwab's management fee system. Similarly, "Adviser G" had $14 million in AUM and 11 subaccounts at Schwab. When Adviser G's registration as an Adviser lapsed with the Commission in mid-December 2012, Schwab restricted Adviser G's ability to charge client fees through Schwab's management fee system. Shortly thereafter, Adviser G requested Schwab to send it $40,375 in management fees from a client's IRA account. Schwab told Adviser G that it could not use Schwab's management fee system because it was not registered and that it would have to collect the fees outside of Schwab.

33. Based on that information, Schwab knew, suspected, or had reason to suspect that Adviser F and Adviser G were engaging or attempting to engage in

1  transactions as unregistered investment advisers and that the transactions or attempted
2  transactions were suspicious under the SAR Rule.  Schwab therefore should have filed
3  a SAR on the transactions.  Schwab, however, did not file the required SARs on the
4  suspicious transactions or attempted transactions of unregistered Adviser because it
5  unreasonably believed that such suspicious transactions did not warrant a SAR filing.

6        34.    As a result of this conduct, Schwab violated, and unless restrained and
7  enjoined will continue to violate, Section 17(a) of the Exchange Act and Rule 17a-8.

## CLAIM FOR RELIEF

### Violations of Exchange Act Section 17(a) of the Exchange Act and Rule 17a-8 [15 U.S.C. § 78q(a) and 17 C.F.R. § 240.17a-8]

11        35.    The SEC realleges and incorporates by reference paragraphs 1 through 34,
12  as though fully set forth herein.

13        36.    In violation of Exchange Act 17(a) and Rule 17a-8 promulgated
14  thereunder, Schwab failed to comply with the reporting, recordkeeping, and record
15  retention requirements of FinCEN's regulations implementing the BSA, Chapter X of
16  Title 31 of the Code of Federal Regulations, which, among other things, require
17  broker-dealers , such as Schwab, to file SARs with FinCEN [17 C.F.R. § 1023.320(a)]..

18        37.    By virtue of the foregoing, Schwab violated, and unless restrained and
19  enjoined, will again violate, Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)]
20  and Rule 17a-8 thereunder [17 C.F.R. § 240.17a-8] by failing to file SARs as required
21  by the BSA and its implementing regulations.
22  ///

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant, and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Exchange Act [15 U.S.C. §78q(a)], and Rule 17a-8 thereunder [17 C.F.R. § 240.17a-8].

### III.

Order Defendant to pay civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: July 2, 2018

*/s/ Lynn M. Dean*
Lynn M. Dean
Kelly Bowers
Attorneys for Plaintiff
Securities and Exchange Commission